Good morning, Your Honor. May it please the Court. Rene Capuola from Orrick-Harrington and Sutcliffe for the petitioner Anwar Haddam. The rule of law in this case has been fundamentally perverted. Mr. Haddam, the classic example of a political refugee, has been the victim of this perversion for 20 years. This case is not about deference or national security. It is about four fundamental legal errors in the two challenged opinions, and we are respectfully asking this Court to correct those errors today. The four errors are as follows. First, the elimination of the nexus and intent requirement in the persecutor of others bar. Second, overruling agency precedent on the persecutor bar without explanation and contrary to the Attorney General's own opinion on this issue. Third, affirming an adverse credibility determination that is also contrary to agency precedent. Fourth, failing to apply this Court's agency precedent in denying Mr. Haddam political asylum. The AG's interpretation of the persecutor of others bar deserves no deference because it is first Second, it is contrary to the legislative history of the statute. Third, it is contrary to 30 years of settled law on this issue decided by the agency and circuit courts around the country. Fourth, it is contrary to international law. And fifth, it violates Mr. Haddam's statutory and constitutional rights to due process. I'll begin by addressing each of those five issues first. How many hearings were there before the IJ in this case? There were four different hearings during the 20 years of this litigation. Well, tell me a little bit how with all of those hearings there was a denial of due process. There was the denial of due process for the simple reason that the government didn't offer any reliable and trustworthy evidence in the 20 years. They didn't offer a single live witness. In contrast, Mr. Haddam presented three of the world's leading experts in Algeria subject to cross-examination. He offered two corroborating witnesses, one of whom was the leading human rights expert in Algeria cited to by the State Department itself in all of their country condition reports subject to cross-examination. He also submitted the evidence of a professor from Columbia University who was the head of the St. Egidio Society, which played a leadership role in the Rome platform which Mr. Haddam signed. Mr. Haddam advocated peace and reconciliation and attempted to bring about a peaceful resolution of the Algerian crisis. Moreover, due process was violated. Importantly, the government said very early on in the first month of the hearings in 1997 that they had obtained a FISA warrant, tapped Mr. Haddam's telephone communications, had those telephone communications, the only means of communication to Algeria. They never produced them. They're not before the court. If Mr. Haddam was a persecutor of others, certainly he would have, those telephone conversations would have had the evidence that he was a persecutor of others. That evidence was never turned over. The Board of Immigration Appeals in its second opinion in 2000 gained security clearance, reviewed the secret evidence and said the secret evidence doesn't assist the government's case at all. You look at the evidence that the government submitted, the Attorney General relies on a statement by Yonah Alexander. Yonah Alexander was not produced as a witness in this case. Yonah Alexander's credentials are not in the record. Yonah Alexander was not subject to cross-examination. The Attorney General in his opinion didn't even cite to let alone discuss the substantial expert testimony that Mr. Haddam presented in the 20 years of this litigation. Moreover, they relied on documents which were unauthenticated. They were mistranslated. They weren't translated. There was original language documents that were never provided to Mr. Haddam. Those reasons, it was a clear violation of agency regulation one after the other. That in its totality under this court's precedent in Anim v. Mukasey leads to the only conclusion that due process was violated in this case. Mr. Haddam was very active with the Islamic, the armed Islamic group and also the Islamic Salvation Front, was he not? He was not. There is no record evidence to show that Mr. Haddam was a member of any armed group. He consistently renounced any right of the political party he belonged to, the only party he belonged to, to have an armed wing. He was, there is no evidence that Mr. Haddam was ever a member of any armed group, that he had any communication with any armed group. Indeed, if the government had such evidence, if he was communicating from the United States to members of armed groups in Algeria, certainly the telephone conversations would have revealed that. No telephone conversations here. Mr. Haddam reflected that he was a self-proclaimed, but generally acknowledged, head of the FIS, parliamentary delegation abroad, and he held that position since 1992. That is correct, although FIS is a political party and there is no evidence in the record other than Mr. Alexander that FIS engaged in any violence in Algeria. FIS was a political party democratically elected to power. It did not go to whether or not he had engaged in any violence in Algeria, as to whether or not these organizations that I mentioned had engaged in violence in Algeria. The expert testimony, Joint Appendix, page 148 and 157, by Francois Bergotte, clearly states FIS did not engage in any violence of any type. The only source for the proposition that FIS engaged in violence is a statement of Yonah Alexander, which is rank hearsay, totally unauthenticated, totally unreliable. It's contradicted by the expert testimony in this case, the same expert who was subject to cross-examination by government counsel. Looking at the legal errors that relate to the persecutor of others bar, the plain language of the statute, if you read the Attorney General's opinion, he doesn't in any way discuss the on-account of language that's in the persecutor bar. He focuses exclusively his interpretation of the persecutor of others bar on the ordered, assisted, incited, or otherwise participated in the persecution of others. Did he have anything to do with the merger of the two main armed groups in Algeria, the GIA and AIS? He did not have anything to do with the merger of any armed groups. What he did say is that he supported the right of the Algerian people to defend himself, and as a politician in the United States, he was going to support the right of his people to defend themselves in the onslaught of a vicious civil war that was initiated by the government that prevented Mr. Haddam from gaining office. There's no evidence to suggest that Mr. Haddam had any role in or any connection with the armed groups. Moreover, and this goes to the due process point, there was a very serious campaign of disinformation regarding feasts in Algeria by the military government. That's confirmed by the expert testimony in this case. Mr. Fuller, who was a consultant to the CIA, and Dr. Bregat, who was the leading French expert on Algeria, both very clearly said there was a campaign of misinformation about the feasts, and its members, including Mr. Haddam, why did they have that campaign of misinformation? Because feasts had won a democratic election, and they were seeking to discredit that democratic party in order to further their rule. So it is very clear in the record that Mr. Haddam had absolutely no connection. There's no nexus, moreover, between anything Mr. Haddam is alleged to have said in newspaper articles, in human rights reports that were submitted into evidence. The totality of the government's case comes down to a few documents that they rely on, a few quotes in their brief that are taken out of context that don't support their case at all. And I think it's important for this court to compare the mountain of evidence that Mr. Haddam submitted, all corroborating his position. The communiques and evidence in this case are all very clear. Mr. Haddam renounced the right of his party, or said his party has no right or wish to have an armed group. He never in any way supported any armed group. And his position was always for a political process to take place. And significantly, he was the one person who pushed hardest for a truth and reconciliation process in Algeria, so that there would be investigations of the violence that was committed in Algeria. And he was fully willing to accept responsibility if it was feast, but there was no evidence to that. And the point about that is that he wanted the truth to be uncovered, and the truth suggests and reveals clearly that he had no involvement in any persecution of any kind. The government that doesn't cite anywhere in their brief or cannot cite to anything in the record that shows any connection between any alleged act of persecution taking place in Algeria and anything Mr. Haddam said or didn't say. So going back to the legal error with respect to eliminating nexus, the on account of language has been interpreted by this court and every other circuit court to say that you need both connection between the applicant and the persecution, and you don't say a thing about it. The first time that this legal conclusion was made was June of 1995 in a legal opinion written by the general counsel of INS that this court took judicial notice of. That opinion essentially lays out the legal arguments that the BIA adopted in 1998 and 2000 when it reversed the denial of asylum and withholding. That general counsel opinion states the following. We do not, this is the document that the court took judicial notice of, it's R6-7, quote, we do not believe that the specific statements relied upon by the asylum officer are sufficient to support a determination that Mr. Haddam has incited persecution of others. That conclusion was adopted by the BIA in 1998. It was adopted by the BIA in 2000. So there's not a single case, even in this case, that held what the attorney general held until he did 11 years after the fact and without any legal support. So the attorney general's opinion reads out of the statute the on account of language. That is clear error and it cannot be justified. There's a third error in his opinion. He says that the persecutor of others bar should be interpreted liberally. He cites a Seventh Circuit case, Cooley v. INS. That case doesn't stand for that proposition. And this is for the second reason, the legislative history of this statute is very clear that there was a change in the language from the first incarnation of this persecutor bar that was in the Displaced Persons Act to the persecutor of others bar that's in the Refugee Act. The legislative history reveals mere membership and advocacy are not sufficient. So the legislative history clearly shows you need a nexus and you need specific intent. The domestic case law on this issue is the same. Every circuit court, including this court, in Hegitt and Tammack v. Holder, very clear. The applicant's conduct must objectively further the persecution. The government cannot cite to a single piece of record evidence showing any link between Mr. Haddam and any persecution. Fourth, international law. The general counsel of INS in 1995 indicated international law requires a nexus. We're here 20 years later. Law has not changed. There is no UNHCR wrote an opinion in this case in 1998. They examined each and every statement that the immigration judge in this case relied on and said international law doesn't justify the application of the bar here either. And fifth, our due process argument we think is on all fours with this court's decision in a name. It's very clear the government is relying on completely untrustworthy, unreliable information. And I think one citation just to, there's no, with respect to all of these articles and documents that they submit that are all hearsay, there's no evidence that any of the authors of those opinions were in Algeria, knew anything about Algeria. They're just reporting the news. Completely unreliable. Again, that is admissible in theory in the immigration courts. There's nothing wrong about having that hearsay evidence come in. But there is something fundamentally wrong when the contrary evidence is completely disregarded, not even mentioned. When in your rapid fire you mentioned international law, do you take the position that international law trumps American law if American law is contrary to international law? We don't take that position because in this case it's not a relevant question because international law is entirely consistent with. This court has held that the Refugee Act should be interpreted consistent with international law because if you can interpret the statutes consistently, the courts will interpret the two statutes to be reconciled. But we, there's no sort of tension between the international law and the domestic law, so there's no need to go there. Now, with respect to the discretionary denial of asylum, again, clear legal error. The Attorney General doesn't even acknowledge the mountain of evidence. The Attorney General relies on Yonah Alexander's statement. The Attorney General relies on all of these newspaper articles. The Attorney General, in this court, I mean the case that we think is, again, on all fours, Zuh versus McKasey, firstly, this court held discretionary denials are exceedingly rare and are based on egregious conduct by the applicant. Here, what egregious conduct is there? There's nothing egregious about what Mr. Haddam did. In fact, everything he did was to promote democracy and the rule of law. The court went on to say the AG does not need to analyze or even list every factor, but he must, quote, demonstrate that he reviewed the record and balanced the relevant factors and must discuss the positive or adverse factors that support his decision. In our briefs, we went through five distinct positive factors that the AG completely overruled. He also had three negative factors, none of which find support in the record. The first is links to armed groups. As I've said earlier, Mr. Haddam had no links to any armed groups and certainly the government would have offered that evidence from Mr. Haddam's own mouth if they had it. Secondly, the Attorney General indicates that he failed to file tax returns based on contributions made to him by people outside of the United States when he wasn't able to work in this country. There's no legal source for that proposition. In fact, we put into our brief the fact that there is no legal requirement. Third, the Attorney General indicates that the American-born children, the three American-born children of Mr. Haddam received aid to dependent families. Absolutely acceptable. They are U.S. citizens fully entitled to that. So on every corner of this decision that the Attorney General issued, there's legal error after legal error after legal error. It has gone on for 20 years. We respectfully request this court to reverse the Attorney General's decision on the discretionary denial of asylum to vacate the Board of Immigration Appeals decision that Mr. Haddam is a persecutor of others and to remand this case back to Judge Croslin, who by the way was asked in 2011 by the Board of Immigration Appeals to review this record to determine if Mr. Haddam was credible in connection with prior proceedings before him. Judge Croslin reviewed the entire record and wrote a very detailed opinion indicating that Mr. Haddam was entirely credible. For all of those reasons and those set forth in our briefs, we respectfully request this court to reverse the two challenged decisions. Thank you. Thank you, Mr. Cathawala. Mr. Fuller. May it please the Court, Chris Fuller for the Attorney General. I'd like to introduce my colleague Lyle Jensers from our National Security Unit in Washington is here to provide some moral support. This case boils down to ultimately three issues. One is the challenge to the Attorney General's personal discretionary denial of asylum, then his construction of what's called the persecutor bar in the statute, whether Mr. Haddam assisted or otherwise participated in the persecutions of others, which makes him ineligible for withholding, and then whether or not the record substantially supports the board's finding that the persecutor bar applied and that Mr. Haddam was ineligible. Ultimately, if in fact the opposing counsel's references to the record are true, then apparently the Attorney General and the board made references to the record out of whole cloth, which certainly isn't the case. We've cited in our brief to multiple locations in the brief, excuse me, in the record, supporting the Attorney General's decision and the board's. Ultimately, what at issue there is that this court has held in a case called Jau Jau, I hope I pronounced that right, D-J-A-U-D-J-O-U, in which the court has freely stated that which is the rule across the country that hearsay evidence is admissible. Documents in the record, both from the press and NGOs and non-governmental organizations like Human Rights Watch, Asylum International, other reports, etc., are in this voluminous 7,000 page record, and are in themselves hearsay. The question is not whether hearsay is admissible. Their point is that once hearsay is admitted, if in fact they believe it should not be listened to or it's negative to Mr. Haddam, then ultimately it shouldn't be considered and therefore relying on it creates some due process concern. Ultimately, during this hearing, one of the multiple hearings that Judge Hamilton referenced, Mr. Haddam's counsel table now, Ms. Cablon, spent a considerable amount of time, this is in the record from pages 48, 45 to about 4903, about 60 pages of this transcript. She referenced 14 separate documents that the government had submitted, all hearsay, in which there were press reports of quotes from Mr. Haddam, other reports from the press, NGO communiques, etc., that the government had put into the record that Mr. Haddam had issued, Mr. Haddam had then presented himself to the court. And she asked him specifically about those documents. In some cases he said, yes, I said that. In some cases he said no. But the key is that at no time did the immigration judge say, Ms. Cablon, we're out of time here. You've gone over enough of these. You can stop now. The complete process was there. She could have talked more than 100 documents were submitted by the government, and she could have gone to each and every one to discuss each one. She stopped. But ultimately the process is what's important here. She had the full opportunity to address each of these, if she wanted to, with Mr. Haddam. In some cases he admitted, in some cases he didn't. So with respect to the due process question, and ultimately their concern about the underlying evidence relied upon, once evidence is admitted, whether or not, if counter evidence is then submitted against it, that's for the trier of fact then to weigh and make determinations. As long as due process is provided for an opportunity to present the counter evidence, then due process is satisfied. And then the trier of fact can rely on that which is admitted. And since hearsay evidence is admissible, it is perfectly reasonable and legal and lawful and not contrary to the Constitution for the and look to admissible, admitted evidence, even if it is hearsay. What this course was concerned about in Jiao Jiao was multiple layers of hearsay, which goes four or five layers down, which ultimately provides no opportunity for putting on counter evidence to challenge. But in these cases, almost, pardon me, yes, it goes, it goes down to some, but ultimately NGO reports, it may in fact be multiple layers, but NGO reports have forever been submitted by aliens to provide background evidence to say this is the circumstances we face in the country. What Mr. Adam is complaining about now is he doesn't like the content of the reports. And hence when the report states that FIS and other organizations and he and his FIS leadership were communicating to or otherwise influencing the armed struggle in Algeria or when they reported, as Judge Hamilton suggested, that they actually, and by his own words, he said, we, through my leadership, combined the armed factions together into one unit, that certainly is evidence that indeed he had access to and influence over people, including these armed factions, in Algeria. So ultimately, yes, an NGO report is hearsay, but it has been admitted and relied upon and used in immigration reports for years and years and years. It's the content that Mr. Adam doesn't like, not its due process weaknesses, and ultimately because it's hearsay, it is admissible and it's legitimate to rely on. How can you defend against an NGO report? How could you? You can put on expert testimony, which is what he did. You put on expert, but then how do you, or you weigh that? Yes, indeed. What he's saying in terms of due process is you allow all this attenuated hearsay, NGO reports, newspaper reports, and then he has direct evidence that that's a lie. It is not true. Well, how do you weigh that and say something was said by somebody in a country that you don't know who they were, when they said it, what the circumstances were, versus a person here? So due process may be a misnomer, but in a sense it becomes a strain and unnatural finding when you allow all of that attenuated hearsay against direct evidence to the contrary. That's the issue. Well, if in fact, I will take, it's a slight issue with that, Your Honor, because there was no direct evidence. Witnesses were not called from Algeria on his behalf. He called experts who in fact then opined with regard to the circumstances in Algeria, which technically speaking is no different than the opinion stated in the NGO report. They were expert witnesses, but the expert witnesses were not Algerian and they were not from Algeria. They were in fact experts who then read materials and did research and then opined with regard to the same. So with regard to your hypothetical, indeed, if direct evidence came in against that which was hearsay, we might have a different issue here. Did it testify? Did Mr. Hadam testify? Yes. Is that direct evidence? That is direct evidence. Was it contrary to the hearsay evidence? In some cases it was. And in some cases, and both the Intuit immigration judges and the Board of Immigration Appeals and the Attorney General found that his attestations that, excuse me, his attestations that he did not know that the G.I.A. and other armed factions were committing atrocities or terrorism was not credible. So there was that finding made with regard to his own testimony. And hence, that again is weighing the testimony. You've got direct evidence versus the hearsay. But when it's direct evidence has credibility problems. Let's drill down a little deeper, Mr. Hadam. Yes. For your NGO reports and your press accounts, how many of them said that he was present and involved in violence? Present meaning not obviously in Algeria, but on a phone, in writing, directed violence, persecution. Even forget about the hearsay. How many said that direct, that he was involved? How many? Answer that question. How many? That's my question. How many? There is no evidence in the record to say he was directly involved. So the answer to my question is none. That's exactly right. Go ahead. You can explain. Okay. Now, and that's because then what happened here is the ultimate question with regard to did the Attorney General's establishment or construction of this law create a new paradigm with regard to whether or not direct involvement is required? The Attorney General stated in his opinion articulating an important policy consideration with regard to whether or not, because we have, you know, there's a, there's a, it'd be better if I just quoted that to you. The United States has significant interest in combating violent acts of persecution and terrorism wherever they may occur, including in Algeria and in its, and it is consistent with these interests to provide, excuse me, it is inconsistent with these interests to provide safe haven to individuals who have connections to such acts of violence. Looking at the past case law, all cited by opposing counsel, is absolutely accurate with regard to requiring a nexus and some sort of a personal involvement. Attorney General looked at the law and looked at the, this general policy and decided no case and, and, and had addressed leaders who were not present but were influencing actions in the country where the persecutions occurred. Based on this policy consideration and then his reading of the, of the construction of the statute, the persecutor bar, which in the Attorney General, looked at the ambiguity of the statute saying that the statute does, the Congress did not define these terms. Congress had not provided parameters for us on how to, on how to, to implement this with respect to that. And in light of this important policy and looking at specific case laws, principles that guide me, the Attorney General then said that then I will fill this gap and construe this statute to allow those, that, that, that were not present at the place in order to implement this policy. So the question becomes, Your Honor, a new question needs to be asked. Okay? Not that, not was, is there any evidence that Mr. Haddam actually personally got involved in the persecution? No, he did not. This is the question with regard to, this is a very important question with regard to policy. Financiers and others like Mr. Haddam who are spokespersons outside of the country, who have influence inside the country because of their leadership positions and his own articulation with regard to, I, through my leadership, combined these armed factions together and, and, and the incidents from the, from the record that the Attorney General relied on and the Board relied on, we've cited in our brief. The question becomes now, if the Attorney General stepped into this gap and reasonably articulated a construction of the statute so it would apply in this policy consideration with regard to leaders outside the country, then personal involvement with getting blood on their hands and doing things with regard into the country is no longer the question to be asked. The question is, did he, did he stay, say things and do things ultimately outside of the country that had an influence in that, so that ultimately he could be looked at and say he encouraged, he promoted, he influenced, he, he, he furthered, or in other words, in the statute, he assisted or otherwise participated in the persecution of others through his leadership position in that country. If, in fact, what you're leaving out is an important step and that's the judiciary step. Yeah, you're right if we accept that the Attorney General can go in and change by a policy reason what they want, what, what the, he wants the policy to be, that's one thing, but we're here to determine whether or not that change has come, become so far-fetched from what the statutory language is that it is, that it is improper. That's because it talks about assist and involved in these action type verbs and instead what you said that basically it makes it so amorphous that as you say, well, policy is if you're involved it doesn't require any direct and so the question is what is active participation now in, in terms that read, is you reading active participation? Well, the statute doesn't say active participation, the statute says assist or assist. That's active. Assist is a verb, it's an active verb, yes. That's right. Okay. It's participation. It says to help or aid. Right, those are active, participation. Go ahead, what's the next one? To help and then to otherwise participate in. Every one is participation. Okay. So how do you read that out by saying, oh, you know, you don't need to participate anymore, you don't need to incite, you don't need to assist. If you're just amorphously involved and somehow just create a karma of violence, it's enough. The Attorney General cited four principles to help justify his construction of the statute to make it reasonable and that's the question that ultimately the court's going to, is the Attorney General's construction reasonable? Right? The four principles were these terms need to be given broad application in these for that general preposition so that it helps inform him. Two, they do not require direct personal involvement. That's case law that ultimately has established long in the persecution bar. No personal involvement is necessary. Three, it's highly relevant whether the alien served in a leadership role in a particular organization, also based on case law. And four, in certain circumstances, statements of encouragement alone can suffice. These were all based on analysis provided by separate courts interpreting these provisions. Okay? Now ultimately the question becomes, did the AG step in and do something ultimately that was reasonable? And the question becomes, is his construction so constrained that it becomes unreasonable or is it based on these principles and a logical extension with regard to applying this provision to persons who are not present but have a leadership role? And that's ultimately for this court to decide and that's really the crux of this entire decision right here because almost the entirety of the argument made by opposing counsel is based on the previous analysis in case law with regard to that nexus and that personal participation in country. How do we reach these people who finance, who promote, who encourage from afar and have influence in country with regard to that? How do we ultimately then address these people and their, I think when Congress left it open, did not define it and used these terms in a way that the courts have interpreted do not require a personal involvement, need to be given broad application, highly relevant that the alien served as a leader, leadership position, certain circumstances and statements of encouragement alone can't suffice. Courts have stated with regard to Cora for example, Sokoloff. You take a hodgepodge of rulings. You basically take a hodgepodge of rulings and say that justifies this strain. Otherwise the Attorney General can make any policy determine they want but this is the law. The Attorney General may construe by wit but we have to construe by the law in courts. Otherwise we don't have due process. That's right. The question is, we don't get into policy. If you want to change the statute, go back to Congress and change the law. We don't get to rewrite the law and the Attorney General can't read it out to the point. You're right, it does require involvement, personal involvement to assist. You may have sent someone money. If you had evidence that he sent somebody money and they used that money to buy arms, you're right, that's assisting. So it's almost an incredible turning logic on his head to say, well we take a hodgepodge, take a one case so you don't have to be involved. But it still requires assisting, inciting, participation. You've written that completely out from a policy standpoint. I don't think we've written that completely out because those terms as the Attorney General articulated can be interpreted to mean I can assist in multiple ways. One is I can say that, for example, when a person is killed in the streets of Algeria, knifed to death and he's a citizen, a non-governmental, non-military person, and he then states on the record that indeed this killing was not a crime but a sentence. And hence, as a spokesperson for FIS and as a leader, he then justifies this killing to all of his listeners to hear that and to his people who did the deed. It's a sentence. That means then that the killing was legitimate, of a citizen, was legitimate, and was even necessary for the purposes of carrying out their goals and wishes. He had the opportunity in the hearing when confronted with that statement, he said yes, I used that word. Given the opportunity to say I didn't use the word, then the question becomes if he says that, and ultimately as a leader, the people who did that hear him as a leader, he is now condoning what they did and doing what? Encouraging them doing it again to justify their actions. How is that not an assistance to provide them back? We both can't talk at the same time. I'm sorry. I talk and you stop and I'll let you have a chance. All right. How is that assisting when you say, what his point was, he said was, my country's involved in a civil war and engagement and they have a right to defend themselves against violence. And you're saying that's assisting? Because you're saying people have a right not to have other people kill them? There are rules of war and there are terrorist acts, and that ultimately killing a civilian on the sidewalk by knife is not an act of war. Like in Syria now, the rebels who defend themselves against the regime in Syria, that they don't have a right to defend themselves? Well, when we hear in the newspaper that those Syrian rebels are executing people on the ground for atrocities, ultimately what happens when these circumstances arise, the question becomes, and this is ultimately what we boil down to, is our immigration laws are apolitical. It doesn't matter whether or not your cause, meaning that they are not, they do not choose sides in a conflict. If the conduct can be described in the provisions as terrorists, then ultimately it doesn't matter whether or not your cause is just, whether you think you're justified in killing that guy on the street because you believe he was involved in providing the regime with advice on how to torture people, he was a civilian on the street. That becomes a terrorist act outside the laws of war, and ultimately under our provisions that then becomes persecution. That would be, but that's not what he said. He said people have a right to defend themselves against people killing them. He didn't say a right for people to kill people and innocent people. That's right. That means the person is aiming, for example, an AK-47 at you, about to pull the trigger, and he's saying you have a right to defend yourself. That's what, inciting what? No, that's not, there's no circumstance like that in the record, your honor, and indeed that's not the case, and I take no issue with the hypothetical. That's what he said, though. That's what he said. He said they have a right to defend themselves. Yes, he did. Against violence. And I take no issue with regard to self-defense. That's not a question here, and nowhere in the record. Where's your evidence that he incited someone to kill innocent children and people? Well, if in fact you require us to show that he said X, and then the next day that person was in fact killed, there is no such evidence in the record. What is the evidence in the record that he incited someone to kill an innocent person? We've never used the word incited, we've talked about the fact that assisting and otherwise. What's the evidence that he assisted killing innocent people? We just gave you one example with regard to the individual, Busebsi was the person's name. He was a citizen, knifed on the street, and after the fact, immediately after the fact, he issued a press release and talked to the press and called this a sentence, executed. It was not a crime, he said. And hence, by doing this, he provides cover for and ultimately encourages similar acts by the armed fighters in Algeria. Are there no consequences for that? Can he simply say whatever he wants? There's First Amendment rights, certainly, but ultimately, if in fact he's the language and voice and the face of the fighters in Algeria, and he's condoning atrocities, which are persecution under the INA, then what are the consequences for his involvement? Is it to say, well, because he's in fact out of the country, and he's not personally getting his hands dirty or bloody, then he can't be held responsible. And remember, we're not taking away his liberty. We're simply saying that he doesn't warrant the government largesse and be able to receive a green card or withholding of deportation. We're not sending back to Algeria. He's received torture convention protection, and that's not at issue here. He's not- You're arguing policy. Of course, the Attorney General can do what he wants in terms of the State Department. I mean, those things are broad executive issues. The question is, are you allowed to construe the law to a point where it evaporates all tethering to concrete, assess, participate? That's the question. And I agree, Your Honor. I agree that that is, in fact, the question. Yes. The policy, we can't get into that. All kinds of things happen- That's right. ... in the name of security. And the question becomes whether or not his construction of these words under this setting in light of what's happened in filling this gap is a reasonable construction. And if it is, it changes the paradigm and, ultimately, the arguments being presented here. And, ultimately, then with regard to the facts and support, indeed, it's hearsay that was relied on, but nonetheless admissible and, therefore, legitimate and not a violation of due process to rely on it. And we've addressed that in our briefs consistently. I've articulated that this is an important case. The Court has recognized the policy considerations, and, ultimately, I do think and agree that it boils down to whether or not the Attorney General, and based on the last citation I'll provide is Ngozi, that talks about ambiguities in the statute and the deference that this Court should provide to the Attorney General if his construction is reasonable. I'm out of time. Thank you for your consideration. If there are no other questions, we'll submit it to the Court and request that the petition be denied. Thank you, Mr. Fuller. Thank you. Mr. Cathawala, you have a brief period. Yes, Your Honor. Thank you very much. Mr. Cathawala, let me ask you this. Do you intend to address your motion that we should take judicial notice of the Internet usage in Aldera? Yes, I will address that if I may reserve that to a little further in my presentation on rebuttal. I just want to respond to several things. I suggest you might do it now. Judge Hamilton asked the question. All right. It's not going to be a rebuttal because it wasn't brought up originally. Well, I think it goes to the point of the connection, but, yes, we think the motion should be granted. The counsel didn't oppose the motion on the legal grounds that this Court must review in determining whether to take judicial notice. The question is whether the work . . . Why didn't you raise that before the IJ or before the Board? Well, we didn't because it wasn't our burden to do so. In other words, they have to come forward with some evidence that there's a connection between events in Algeria and Mr. Haddad. They haven't. We just wanted to make it crystal clear . . . If it wasn't your burden, why did you file this motion? Well, because we thought it was a relevant fact that the Court could take judicial notice of to confirm the conclusion that there is absolutely no nexus because the only record evidence before the Court as to the mode of communication between Mr. Haddad and Algeria was telephone. And so we wanted to . . . I don't want to belabor the whole point, but I don't understand why you say it's not your burden to bring this motion before the Court. It was our burden to bring the motion, but what I was saying is that there's no record evidence that the government has come forward with to show that any press statements, whether by telephone, fax, or . . . We've got a preservation problem. We normally don't consider things that were not raised below. And you had four IJ hearings. The Board considered it, and this is the first time you brought it before us. And I would say, going to the merits of the motion, that there may well have been other means by which people in Algeria, between 1993 and 1997, newspapers, radio ads, blah, blah, blah, reading foreign papers, et cetera, could have heard of some of this. I'm not saying that they did, but I'm just saying that there were other means available for them to have been informed about this. Your Honor, we would respect that and then withdraw the motion. That's fine. I mean, we think the evidence is very clear, and this is in rebuttal to what Mr. Fuller said. There's no evidence that any press statements that the government is relying on were ever received in Algeria. The record evidence is clear that Mr. Adam had no contacts with people in Algeria. The media was closed, censored, completely controlled by the government. He mentioned the Human Rights Watch. Joint Appendix, page 554, states that Human Rights Watch didn't have anybody in the country since 1992. They're relying on that evidence. With respect to Mr. Fuller's claim, it's true that we did not call an expert witness who lived in Algeria, but we called a corroborating witness, Abdenour Ali Yahia, who is cited to in the State Department reports. He's the leading human rights advocate in Algeria. Our own State Department relies on him. He was on the ground. He was in the country. If there was a person who would have known that Mr. Adam was involved in persecution, it would have been Mr. Ali Yahia. So we have a very detailed affidavit from him. The government had the right to cross-examine him and chose not to. With respect to this claim about national security interests, it's important to look at Joint Appendix, page 543. This is the State Department report that was introduced into evidence that was dated January 1997, two months before the trial in this case, the first trial in this case, happened. Quote, the removal of Mr. Adam to Algeria would also have negative security implications for U.S. national interests overseas, including raising the risk to our embassy in Algiers. That's the only record evidence before this court on the question of national security. Mr. Fuller repeated that the Attorney General looked at the law and interpreted it and that his interpretation is entitled to deference. There's absolutely no deference entitled to the AG when he violates the plain language of the statute, when he fails to consider the legislative history, when he fails to consider any of the domestic or international case law. Is he entitled to deference if he had done that? Yes, but this is not that case. Finally, Mr. Fuller talked about this murder, and I think it's important for the court to hear the testimony of Dr. Boutsepsi. The record is clear. Mr. Adam testified that he learned of Dr. Boutsepsi's death on the news. He had no idea that he was going to be killed. He learned about it after the fact. He was very shocked that an intellectual had been assassinated. That's his testimony. Joint appendix, page 646. He testified that he called a member of his party, FIS, in Algeria to try to find out some information about what happened. He testified that he was told that Dr. Boutsepsi was involved, quote, in torturing and the torture of some executive member of FIS, that maybe that was the reason why he was killed. He later testified that he gave an interview to Agency France-Presse after the event, and he said, quote, I told them that I had just heard about it, and it seemed he was involved in the torture of some members of FIS. Maybe that was the reason why he was killed. I said I am against the principle, against the killing of any intellectuals. He testified that he may have said Dr. Boutsepsi's death could have been a sentence for his torture of FIS members. Joint appendix 235. He also testified concerning this killing significantly that he called for an independent commission of inquiry to investigate, to have an independent commission to see what was going on and why Dr. Boutsepsi was killed. The board looked at all of these statements, and they said, and this is, we think, on point, that through that testimony, Mr. Haddam did not express a view that Dr. Boutsepsi or intellectuals of the class should be targeted. Moreover, rather than condoning the killing outright, Mr. Haddam called for an independent commission. And you know what, in this case, what happened in 2008? Mr. Haddam obtained the sworn testimony of the third highest ranking member of the DRS, the military itself, who testified under oath that it was the DRS that assassinated Dr. Boutsepsi. So Mr. Haddam is even disproved through his own evidence in this case that he had no involvement in this act of violence. Mr. Fuller indicated that the government is not attempting to take away his liberty. His liberty has been taken away from him for 20 years in this litigation, senseless litigation, we believe. He has been deprived the right to work. He's been deprived the right to adjust to status. So the notion that the government has not taken away his liberty is absolutely not true. We submit for all the reasons presented that the two decisions should be vacated, the matter should be remanded to the immigration judge. Thank you.
judges: Roger L. Gregory, Stephanie D. Thacker, Clyde H. Hamilton